United States District Court
Southern District of Texas
**ENTERED**
February 19, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RHETT VAUGHN POSEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-3293 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[2] are Defendant's Cross-Motion for Summary Judgment (Doc. 16) and Plaintiff's Motion for Summary Judgment (Doc. 20). The court has considered the motions, Defendant's response to Plaintiff's motion, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner

---

[1]    In his complaint, Plaintiff named Carolyn W. Colvin, former Commissioner of the Social Security Administration, as defendant. Nancy A. Berryhill is now Acting Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 11, Ord. Dated Jan. 19, 2018.

("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act ("the Act").

## A.  **Medical History**

Plaintiff was born on August 19, 1968, and was forty-five years old on the alleged disability onset date of December 21, 2013.[3]  Plaintiff graduated from high school and worked as a service truck driver and fuel truck driver.[4]  The medical records generally support a history of treatment for a seizure disorder and osteoarthritis, among other ailments.[5]

### 1.  Seizures

In 2011, Toan Vu, M.D., ("Dr. Vu") prescribed Keppra (generically known as Levetiracetam) to prevent seizures.[6]  A complex seizure in January 2014 required the summoning of an ambulance.[7]  Five days after the seizure, Mark Randolph, M.D., ("Dr. Randolph") evaluated Plaintiff.[8]  The only abnormalities

---

[3]     See Doc. 10, Tr. of the Admin. Proceedings ("Tr.") 284, 289, 321, 342.

[4]     See Tr. 55-57, 86, 320, 325-26.

[5]     Where medical records are duplicated in the transcript, the court made no effort to cite all copies.

[6]     See Tr. 378.

[7]     See Tr. 402-04, 408.  The record does not indicate what treatment, if any, Plaintiff received at a medical facility.

[8]     See Tr. 408-10.

2

noted were fatigue, dizziness, fainting, headaches, dry skin, depression, and sleep disturbance.[9]

On April 4, 2014, Plaintiff saw Physician Assistant Byron Slusher ("PA Slusher"), who worked in the same practice group as Stephen Richardson, M.D., ("Dr. Richardson").[10]  Without recording any patient complaints or examination results, PA Slusher ordered a test to determine Plaintiff's Keppra level, instructed Plaintiff to continue his dosage of 3,000 milligrams per day, and referred him to neurology.[11]  PA Slusher continued that dosage of Keppra at an appointment on May 8, 2014.[12]

On May 30, 2014, PA Slusher indicated in the appointment notes that Plaintiff's seizure disorder was controlled and that Plaintiff's condition vis-a-vis seizures was fair.[13]  At that appointment, Plaintiff's daily dosage of Keppra was lowered from 3,000 milligrams to 2,500 milligrams per day.[14]  Dr. Richardson also recorded a treatment note for the same appointment that reflected the new Keppra dosage.[15]

In July 2014, while remaining on a Keppra dosage of 2,500

---

[9]    See Tr. 408.

[10]    See Tr. 965-66.

[11]    See id.

[12]    See Tr. 962-64.

[13]    See Tr. 434.

[14]    See Tr. 436-37.

[15]    See Tr. 960.

milligrams per day, Plaintiff reported on a state agency form, that he had experienced six seizures in the prior eight months since November 2013.[16]  Plaintiff's descriptions indicate that two of the six were severe.[17]

On September 15, 2014, Plaintiff saw PA Slusher, who recorded no examination results and lowered Plaintiff's Keppra dosage to 1,500 milligrams per day.[18]  Although the treatment note did not state that Plaintiff stopped taking his medications, PA Slusher noted that Plaintiff "need[ed] to be back on Keppra for at least 10 days before doing the [Keppra-level] test."[19]

On October 7, 2014, Dr. Vu evaluated Plaintiff for seizures.[20] Plaintiff reported that "he still on and off experience[d] seizures, about 1-2 times per year" with the most recent having been six months prior to the appointment.[21]  Plaintiff described experiencing "prolonged postictal lethargic [sic] and no recollection."[22]  Dr. Vu reviewed previously performed imaging results, including an unremarkable brain magnetic resonance imaging

---

[16]     See Tr. 341.

[17]     See id.

[18]     See Tr. 957-59.

[19]     Tr. 957.

[20]     See Tr. 481-83.

[21]     Tr. 481.

[22]     Tr. 483.

("MRI").[23]   The treatment note indicated that Plaintiff's Keppra dosage was 3,000 milligrams per day.[24]

When presenting for an outpatient electroencephalogram ("EEG") on October 24, 2014, Plaintiff experienced a seizure that precipitated hospitalization.[25]   Plaintiff required wound intervention for injuries sustained from a fall during the seizure.[26]   A computerized tomography (CT) scan later that day identified "[n]o significant intracranial abnormality."[27]   On October 31, 2014, Plaintiff followed up with Dr. Richardson, who recorded no examination results.[28]   Dr. Richardson's notes inexplicably reflected that Plaintiff's Keppra dosage had been *increased* to 2,000 milligrams per day, this despite Dr. Vu's early October note indicating that Plaintiff's daily dosage was 3,000 milligrams.[29]

At an appointment with Dr. Vu on November 13, 2014, Plaintiff reported that he had been taking on 1,500 milligrams of Keppra daily due to his confusion about the dosage.[30]   Dr. Vu instructed

---

[23]    See Tr. 481.

[24]    See id.

[25]    See Tr. 479, 489-546, 916-46.

[26]    See Tr. 498-99, 916.

[27]    Tr. 969.

[28]    See Tr. 952-53.

[29]    See Tr. 952.

[30]    See Tr. 479.

Plaintiff to increase his dosage to 2,000 milligrams per day.[31]

On March 23, 2015, Plaintiff visited Dr. Richardson for a follow up.[32] Plaintiff reported increased seizure frequency, having experienced four in five months.[33] The doctor recorded no examination results but renewed referral to neurology because Plaintiff was on "max dose of Keppra."[34] However, the treatment note reflected that Plaintiff's Keppra dosage was only 2,000 milligrams per day.[35]

On April 7, 2015, Plaintiff reported experiencing, on average, one seizure per month.[36] Dr. Vu increased Plaintiff's Keppra dosage to 3,000 milligrams per day and also prescribed the medication Aptiom (generically known as Eslicarbazepine) for the seizure disorder.[37] Dr. Vu instructed Plaintiff to take 400 milligrams of Aptiom daily for one week and then to increase the dosage to 800 milligrams daily.[38] At an appointment on July 8, 2015, Plaintiff

---

[31]   See id.

[32]   See 949-50.

[33]   See Tr. 949.

[34]   See id.

[35]   See Tr. 950.

[36]   See Tr. 477.

[37]   See Tr. 479; but see Tr. 378 (indicating that Dr. Vu first prescribed Aptiom in November 2015).

[38]   See Tr. 479.

reported experiencing a small seizure in May 2015.[39]

On August 6, 2015, Plaintiff underwent an electroencephalogram ("EEG") hours after experiencing a "big seizure."[40]  The EEG results were normal during awake and drowsy states with no active seizure observed.[41]  In a treatment note from August 26, 2015, Dr. Vu stated that Plaintiff reported that he was no longer experiencing "obvious night time seizures."[42]

On January 20, 2016, Plaintiff attended an appointment with Dr. Vu, who observed that Plaintiff "did not appear [to be] in distress and was pleasant."[43]  Plaintiff self-reported "3 seizures at the same day 1 month ago and another one 3 days later" and "fell hitting his face to the ground causing bruising [to] the hip and face."[44]  The examination results were the same as previous appointments and, overall, fell within the normal range.[45]

On April 22, 2016, Plaintiff's prescriptions remained at 3,000 milligrams of Keppra daily and 800 milligrams of Aptiom daily.[46] Plaintiff's chief complaint was that he "still ha[d] had some

---

[39]    See Tr. 476.

[40]    Tr. 474, 488.

[41]    See Tr. 488.

[42]    Tr. 474.

[43]    Tr. 991.

[44]    Id.

[45]    See Tr. 991-92.

[46]    See Tr. 1007-08.

seizures."[47]  Specifically, Plaintiff said, he had experienced three seizures since his last visit three months earlier.[48]  Plaintiff reported continuing issues with maintaining sleep and feeling tired in the mornings.[49]  Dr. Vu's note stated that a routine EEG was normal.[50]  The examination results again were within normal limits.[51]

### 2.  Osteoarthritis

On May 8, 2014, Plaintiff attended an appointment with PA Slusher complaining of bilateral shoulder, left knee, and right elbow pain.[52]  The treatment note included no results from a physical examination, but PA Slusher ordered x-rays of both shoulders and the left knee.[53]  On May 21, 2014, the x-rays were performed.[54]  Other than moderate osteoarthritis in the shoulder joints, those x-rays were unremarkable.[55]  The knee x-ray revealed osteoarthritis with joint effusion and narrowing but "[n]o fracture, dislocation, or destructive bony lesion."[56]

---

[47]  Tr. 1007.

[48]  See id.

[49]  See id.

[50]  See id.

[51]  See 1007-08.

[52]  See Tr. 962-64.

[53]  See id.

[54]  See Tr. 981-83.

[55]  See Tr. 982-83.

[56]  See Tr. 981.

On May 30, 2014, PA Slusher saw Plaintiff to discuss the x-ray results.[57]  PA Slusher noted moderate, bilateral shoulder pain with motion but identified no limitations on the range of any joint.[58] The treatment plan for osteoarthritis was medication to treat joint pain and swelling.[59]

On September 15, 2014, Plaintiff was seen by PA Slusher, who recorded no examination results but indicated a plan of ordering MRIs of both knees and both shoulders.[60]  The MRIs of Plaintiff's knees revealed complex medial meniscus tears and arthrosis in both knees and cartilage loss in his left knee.[61]  Shoulder MRIs performed on October 21, 2014, revealed tendon tears in both shoulders and a "[l]arge amount" of acromioclavicular arthropathy on the left and moderate arthrosis on the right.[62]  In January 2015, Plaintiff underwent arthroscopic surgery on his left shoulder to repair a rotator cuff tear.[63]

In October 2015, Plaintiff attended an appointment with Dr.

---

[57]     See Tr. 432-37.

[58]     See Tr. 434.

[59]     See Tr. 434-35.

[60]     See Tr. 957-59.

[61]     See Tr. 600-02.  The court was unable to locate shoulder MRIs performed in September 2014.

[62]     Tr. 547; see also Tr. 546, 548-49.

[63]     See Tr. 715-22, 728-876.

Richardson to address knee pain.[64]  Dr. Richardson's treatment note included no examination results.[65]  The recorded diagnosis was osteoarthritis of both knees.[66]  Doctor and patient discussed medication options and decided to discontinue Naproxen in favor of Ibuprofen.[67]  Dr. Richardson advised Plaintiff "to take as few [ibuprofen] as possible, stay active, and consider[] some non-pharmacolgic options."[68]

At appointments in October and November 2014, in April, July, and August 2015, and in January and April 2016, Dr. Vu observed and noted that Plaintiff demonstrated no abnormal movement, a normal gait, and the ability to perform tandem, tip toes, and heels walk.[69] Motor system examinations performed at all of those appointments were normal.[70]

**B.  <u>Application to SSA</u>**

On April 9, 2014, Plaintiff protectively applied for disability insurance benefits and supplemental security income

---

[64]    <u>See</u> Tr. 947-48.

[65]    <u>See id.</u>

[66]    <u>See</u> Tr. 947.

[67]    <u>See id.</u>

[68]    <u>Id.</u>

[69]    <u>See</u> Tr. 475-83, 990-92, 1007-08.

[70]    <u>See</u> Tr. 475-76, 478, 480, 482, 991-92, 1008.

10

benefits claiming an inability to work since December 21, 2013,[71] due to anxiety, depression, seizures, obesity, hypertension, and shoulder and knee joint pain.[72]

On August 11, 2014, the SSA found Plaintiff not disabled at the initial level of review.[73]  The reviewing medical consultant opined that Plaintiff's only medically determinable impairment was epilepsy, but it was not severe.[74]  On September 19, 2014, the SSA again found Plaintiff not disabled upon reconsideration.[75]  The reviewing medical consultant agreed with the prior assessment as to medically determinable impairments and severity.[76]

On October 9, 2014, Plaintiff requested a hearing before an ALJ.[77]  On February 25, 2016, the ALJ granted Plaintiff's request for a hearing and set it for May 2, 2016.[78]

In April 2016, prior to the hearing, Dr. Vu completed a Seizure Questionnaire and Dr. Richardson completed a Pain

---

[71]   Two years prior to these applications, Plaintiff applied for disability with an alleged onset date of October 11, 2011.  See Tr. 127. Plaintiff withdrew his appeal of the ALJ's decision, and the Appeals Council dismissed the application on February 19, 2015.  See Tr. 144-45.

[72]   See Tr. 11, 92-93, 99-100, 284-90.

[73]   See Tr. 92-107, 149-56.

[74]   See Tr. 96, 103.

[75]   See Tr. 108-123, 161-66.

[76]   See Tr. 112, 119.

[77]   See Tr. 167-68.

[78]   See Tr. 211.

11

Questionnaire, standardized forms that were provided to the doctors by Plaintiff's attorney.[79]

Dr. Vu, Plaintiff's doctor for two years at the time, stated that Plaintiff was diagnosed with a seizure disorder that had worsened over time.[80]  Dr. Vu identified the type of seizure as tonic-clonic or grand mal.[81]  He answered "yes" to the questions whether continuous medication was required for seizure control and whether the medication had been frequently titrated upward and answered "no" to whether the medication caused side effects.[82]  As to a question asking the "average frequency of major seizures in the past 6 months," Dr. Vu circled "[a]t least 1 per month over past year," the most frequent option available on the questionnaire.[83]  He did not mark any of the frequency options for minor seizures.[84]  In describing Plaintiff's experience, Dr. Vu marked the following five of eight listed postictal symptoms: (1) drowsiness; (2) confusion; (3) reduced ability to concentrate, think, or plan; (4) decreased verbal skills; and (5) decreased interactive ability.[85]  Dr. Vu expected Plaintiff's absenteeism from

---

[79]   See Tr. 1003-05.

[80]   See Tr. 1003.

[81]   See id.

[82]   See id.

[83]   Id.

[84]   See id.

[85]   See id.

work to be four or more days a month.[86]

On the Pain Questionnaire, Dr. Richardson, Plaintiff's doctor for eighteen months at the time, indicated that he was diagnosed with osteoarthritis of the left shoulder/acromioclavicular joint.[87] Dr. Richardson confirmed that Plaintiff reported flare-ups and pain consistent with his condition.[88]  The doctor opined that Plaintiff's or other symptoms constantly would be "severe enough to interfere with the attention and concentration needed to perform even simple work tasks."[89]  Plaintiff's pain medication, according to Dr. Richardson would cause "stomach upset."[90]  Estimating that Plaintiff would have six bad days out of an average week, Dr. Richardson estimated that Plaintiff would miss four or more days a month.[91]

## C. **Hearing**

At the hearing, Plaintiff and a vocational expert testified.[92] Plaintiff explained that osteoarthritis, anxiety, and high blood pressure prohibited him from working.[93]  Plaintiff stated that he

---

[86]     <u>See</u> Tr. 1004.

[87]     <u>See</u> Tr. 1005.

[88]     <u>See</u> <u>id.</u>

[89]     <u>Id.</u>

[90]     <u>Id.</u>

[91]     <u>See</u> <u>id.</u>

[92]     <u>See</u> Tr. 52-91.

[93]     <u>See</u> Tr. 57-58.

13

first experienced mild seizures in 2010 or 2011.[94]   The seizures became more severe over time, he said, and precipitated a near-fatal accident when he experience a seizure while driving in 2012.[95]

On four occasions since 2012, Plaintiff said, he had experienced seizures that "all required ambulance and medical treatment and surgery and sedation and to that nature [sic]."[96]   He said that he was hospitalized for one and one-half days after one of those seizures and that it took fourteen hours to regain his faculties.[97]

Plaintiff said that he also experienced smaller seizures, the symptoms of which had been described to him as "talking like in a slumber mood, like gibberish," "eyes roll[ing] back in [his] head," "eyes . . . looking in different directions," and "jaw . . . grinding."[98]   Plaintiff reported that afterward, he experienced a five-minute slumber period with euphoria and felt groggy and off balance.[99]   After ten to fifteen minutes, he said, his balance returned and his head cleared.[100]   Plaintiff testified that he had experienced four or five of the smaller seizures in the prior two

---

[94]    See Tr. 58.

[95]    See Tr. 58-59.

[96]    Tr. 70.

[97]    See Tr. 75.

[98]    Tr. 71.

[99]    See Tr. 71, 73-74.

[100]   See Tr. 74-75.

months.[101]

Plaintiff stated that he saw a neurologist after the accident and began medications.[102]  When asked about the efficacy of his medications, Plaintiff said, "They work I guess to an extent.  I'm still hav[ing] allures.  I've still had massive seizures.  Everything else I've had a lot of side effects from them, all the medications I'm taking together."[103]  The only side effects Plaintiff discussed were tiredness from insomnia and abnormal bowel movements.[104]  According to Plaintiff, he was not medically cleared to go anywhere without an escort.[105]

Regarding his shoulder pain, Plaintiff reported that surgery helped alleviate, but not eliminate, the pain in his left shoulder.[106]  Although able both to raise his left hand above his head and to reach to pick up an item, Plaintiff testified, neither motion was without pain.[107]  In fact, he said, the pain was constant except for two or three hours of sleep.[108]  Plaintiff reported that his right shoulder was "probably a lot worse" and he needed a

---

[101]    See Tr. 71-75.

[102]    See Tr. 59.

[103]    Id.

[104]    See Tr. 75-77, 84-85.

[105]    See Tr. 72.

[106]    See Tr. 65.

[107]    See id.

[108]    See Tr. 66.

15

complete shoulder replacement.[109]   Both knees also were due for total replacements, he said.[110]

Plaintiff told the ALJ that he owned a small farm where he raised goats, sheep, and chihuahuas.[111]  He said that he lived there by himself, but periodically required help to care for his animals.[112]  Plaintiff described the work that he performs on his farm: "I pretty much sit in my chair every day and, you know, sit out there and water them and fresh water and clean it out and I can add bleach to it to kill any parasites that might be in there, but my buddy does bring the hay."[113]   In total per day, he said, he spent ninety minutes to two hours "actively physically" tending to the goats and sheep.[114]

Other than that, Plaintiff said, his only other activity was to "tinker around [his] place."[115]  Plaintiff also reported keeping up with news and weather online daily and visiting an out-of-town friend once a month.[116]  Plaintiff said he went grocery shopping

---

[109]    Id.

[110]    See Tr. 68.

[111]    See Tr. 60.

[112]    See id.

[113]    Tr. 62.

[114]    See id.

[115]    See Tr. 78.

[116]    See Tr. 79-80.

with friends.[117]   Plaintiff estimated that he could pick up ten
pounds but no more than twenty.[118]

The vocational expert testified after Plaintiff and classified
Plaintiff's prior work as lubrication servicer, which required
medium exertion and skill level four, and tank truck driver, which
required medium exertion and skill level three.[119]   The ALJ
described a hypothetical individual of the same age, education, and
past work experience as Plaintiff with:

> a residual functional capacity for a reduced range of
> sedentary work, with postural limitations never on
> climbing ladders, ropes and scaffolds, never kneeling,
> never crawling, occasional on the other postural
> functions, climbing ramps and stairs, balancing, stooping
> and crouching, [o]verhead reaching bilateral no more than
> five percent of the time, reaching other than overhead
> bilateral, as well as the other manipulative functions,
> handling, fingering and feeling all at the frequent
> level, no more than frequent. Environmental limitations,
> never on exposure to vibration, moving mechanic parts,
> electric shock, hazardous (INAUDIBLE) radiation and
> explosives.  No more than occasional on the other
> environmental factors, such as the weather, cold, hot,
> wet, humid environments, as well as fumes, odors, dusts,
> gases, poor ventilation. Use of foot controls, including
> driver, never.[120]

The vocational expert agreed with the ALJ that the limitation to a
sedentary RFC ruled out Plaintiff's prior work but identified
document preparer, final assembler, and table worker as possible

---

[117]    See Tr. 81.

[118]    See Tr. 69-70.

[119]    See Tr. 86.

[120]    Tr. 86-87.

occupations.[121]

The ALJ presented a second hypothetical question in which he added "[n]o more than occasional contact with public, coworkers, [and] supervisors with reasoning, math, and language requirements at the lowest, general educational level."[122]   Although the vocational expert eliminated the document preparer occupation, he opined that the other two previously identified occupations were still possibilities and added glass waxer.[123]   Regarding employer tolerance for absenteeism, unscheduled breaks, non-productive activity, and off-task behavior, the vocational expert explained that employers would allow one to two sick days per month on a chronic basis and that they would have limited tolerance for the other described behavior, such as one to fives minutes per hour for restroom breaks.[124]   He said that no employer would tolerate recumbent rest breaks outside of the usual break periods or the inability to stand, walk, and sit in combination for eight hours per workday.[125]

**D.   Commissioner's Decision**

---

[121]   See Tr. 87.

[122]   Id.

[123]   See Tr. 87-88.

[124]   See Tr. 88.

[125]   See Tr. 88-89.

18

On August 19, 2016, the ALJ issued an unfavorable decision.[126] The ALJ found that Plaintiff had not engaged in substantial gainful activity since December 21, 2013, the alleged onset date.[127]   The ALJ recognized the following impairments as severe: (1) seizure disorder; (2) osteoarthritis of the shoulders, knees, and feet; (3) hypertension; (4) obesity; and (5) anxiety disorder.[128]   The ALJ gave little weight to the medical consultants who found that Plaintiff's seizure disorder was his only medically determinable impairment and that it was nonsevere.[129]

At the next step, the ALJ found that Plaintiff did not meet the requirements of any Listing described in the listings of the regulations[130] (the "Listings"), specifically addressing Listings 1.02 (major dysfunction of a joint), 11.02 (epilepsy-convulsive epilepsy),[131] 11.03 (epilepsy-nonconvulsive epilepsy), and 12.06

---

[126]     See Tr. 11-23.

[127]     See Tr. 13.

[128]     See id.

[129]     See Tr. 14.

[130]     See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[131]     Since the ALJ's decision issued, the SSA revised the Listings for neurological disorders, consolidating convulsive and nonconvulsive epilepsy Listings into one and reserving Listing 11.03 for future use, effective September 29, 2016. See Program Operations Manual System (POMS) DI 27516.010 Disability Determination Services (DDS) Medical Evaluation Criteria to Determine Applicability of Res Judicata, SSA (Sept. 20, 2017), https://secure.ssa.gov/poms.nsf/lnx/0427516010; compare 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 11.02, 11.03 (2014) with 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02 (2017)

(anxiety-related disorders).[132]   The ALJ found that the record did not contain the required evidence of a gross deformity, "an inability to perform fine and gross movements effectively" in the upper-extremity joints, or "an inability to ambulate effectively" in the weight-bearing joints.[133]   The ALJ noted that Listing 11.02 required evidence of convulsive seizures more frequently than once a month after at least three months of treatment and Listing 11.03 required evidence of nonconvulsive seizures more frequently that once a week after three months of treatment.[134]   The ALJ acknowledged a spate of three seizures on a single day in December 2015 but found that "the documented frequency of seizure attacks d[id] not satisfy" the criteria of either Listing.[135]   The ALJ further found that Plaintiff's limitations in the areas of activities of daily living, social functions, and/or concentration, persistence, or pace were not severe enough to meet the Listing 12.06 criteria and that he had experienced no episodes of decompensation.[136]

The ALJ discussed the medical treatment for Plaintiff's impairments, including the treatment notes of Drs. Vu and

---

[132]   <u>See</u> Tr. 14-16.

[133]   Tr. 14. (internal quotation marks omitted).

[134]   <u>See id.</u>

[135]   <u>Id.</u>

[136]   <u>See</u> Tr. 15-16.

20

Richardson, as well as the questionnaires they completed.[137]  About

Dr. Vu's Seizure Questionnaire, the ALJ stated:

> I . . . give little weight to the April 2016 Seizure
> Questionnaire from [Dr. Vu], [Plaintiff's] treating
> neurologist.  Dr. Vu determined that [Plaintiff's]
> seizure disorder would cause him to miss at least four
> days of work per month.  This opinion is inconsistent
> with his treatment records.  Though Dr. Vu commented that
> [Plaintiff's] seizure medication has been frequently
> titrated upward, the treatment notes indicate that
> [Plaintiff] has taken the same dosage of Keppra (1500
> milligrams twice a day) and Aptiom (800 milligrams daily)
> since beginning regular treatment in October 2014.
> Furthermore, as mentioned above, [Plaintiff's]
> examinations have generally been normal, with no residual
> symptoms from his seizures alleged or demonstrate.
> Indeed, based on Dr. Vu's Questionnaire and [Plaintiff's]
> self-reported history of seizures, [Plaintiff] likely has
> had about one seizure episode per month, which does not
> suggest that he would miss at least four days of work per
> month due to this problem.  [Plaintiff] did report
> experiencing three seizures in the same day in December
> 2015, but the absence of multiple attacks in other months
> suggest that this is more the infrequent exception than
> the rule.[138]

With regard to Dr. Richardson's Pain Questionnaire, the ALJ

stated:

> I accord little weight to the April 2016 Pain
> questionnaire from [Dr. Richardson].[139] . . . Dr.
> [Richardson] concluded that [Plaintiff's] pain symptoms
> from his left shoulder would constantly interfere with
> his attention and concentration on simple work tasks and
> would cause him to miss at least four days of work per
> month.  This opinion is not fully consistent with the
> record as a whole. [Plaintiff] underwent surgery on the
> left shoulder in January 2015, but there is no

---

[137]    See Tr. 16-20.

[138]    Tr. 20 (internal citations omitted).

[139]    The ALJ mistakenly attributed the Pain Questionnaire to Dr. Randolph,
which appears to be a scrivener's error.  See id.

substantial objective evidence to support continued functional limitations involving this shoulder after the surgery. I considered the problems in the right shoulder and knees, which are serious but not to the extent that they would disrupt his ability to work more than four times a month. Examinations of [Plaintiff's] motor functioning since October 2014 have been normal. Furthermore, Dr. [Richardson's] opinion contains no more than a cursory explanation based in the medical evidence.[140]

The ALJ provided a very detailed RFC and explained throughout his discussion of the medical evidence what limitations he included to address each of Plaintiff's impairments, severe or nonsevere.[141] The ALJ's assessment resulted in the following RFC:

> After careful consideration of the entire record, I find that [Plaintiff] has the [RFC] to perform sedentary work . . . except that he can never climb ladders, ropes, or scaffolds and never kneel or crawl; only occasionally climb ramps and stairs and occasionally balance, stoop, and crouch. Furthermore, [Plaintiff] can reach overhead bilaterally no more than 5 percent of the time. He is able to reach, other than overhead bilaterally, as well as handle, feel, and finger, no more than frequently. [Plaintiff] can have no more than occasional exposure to the environmental factors of weather, cold/hot/wet/humid environments, as well as fumes, odors, dusts, gases, and poor ventilation. [Plaintiff] can have no exposure to the environmental factors of vibration, moving/mechanical parts, electric shock, hazardous/exposed places, radiation, and explosives. [Plaintiff] can never use foot controls, including driving. He can have no more than occasional contact with the public, co-workers, and supervisors. From a general educational development . . . standpoint, [Plaintiff] retains the reasoning, mathematics, and language abilities to perform simple work with understanding and carrying out simple one-or two-step instructions, dealing with standardized situations with occasional or no variables in situations

---

[140]    Id. (internal citations omitted).

[141]    See Tr. 16-20.

encountered on the job, performing basic arithmetic operations, and reading, writing, and speaking in simple sentences using normal word order.[142]

Relying on the vocational expert's response to a hypothetical question regarding an individual with the same limitations as the ALJ's RFC assessment, the ALJ found Plaintiff unable to perform his past relevant work but able to perform the jobs of final assembler, table worker, and glass waxer.[143]   Therefore, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date of the ALJ's decision.[144]

On September 15, 2016, Plaintiff appealed the ALJ's decision.[145]   On September 5, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[146]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[147]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of

---

[142]   Tr. 16 (internal citations and footnotes omitted).

[143]   See Tr. 20-22.

[144]   See Tr. 22.

[145]   See Tr. 282.

[146]   See Tr. 1-5.

[147]   See Doc. 1, Pl.'s Orig. Compl.

whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled

24

without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.   The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.   Greenspan, 38 F.3d at 236.

## B.   Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance." Id.   The Commissioner has the responsibility of deciding any conflict in the evidence. Id.   If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ erred by: (1) finding that Plaintiff's seizure disorder did not meet or equal the severity of Listing 11.02; and (2) giving little weight to Plaintiff's treating physicians' opinions on disability.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.  Listing 11.02

The Listings "describe[] for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his . . . age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  If the requirements of any Listing are met or equaled by an individual's impairment, the individual is presumptively deemed disabled.  Whitehead v. Colvin, 820 F.3d 776, 780-81 (5th Cir. 2016); see also 20 C.F.R. §§ 404.1525, 416.925. Plaintiff bears the burden of showing that his impairment meets all of the specified medical criteria.  Id. at 781 (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)).  Listing 11.02 concerns the

neurological impairment of epilepsy and, at the time of the ALJ's decision, stated:

> 11.02 Epilepsy-convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:
>
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

Plaintiff focuses on the frequency requirement, arguing that the ALJ failed to "cite" Dr. Vu's "notes" indicating that Plaintiff reported experiencing three seizures in one day in December 2015 and one three days later and opining, in the Seizure Questionnaire, that Plaintiff suffered at least one major seizure per month over the past year.[148]   Defendant responds that Plaintiff fails to demonstrate that his seizures met the frequency requirement.

In the ALJ's discussion of Listings 11.02 and 11.03, he cited Dr. Vu's April 22, 2016 treatment note that stated Plaintiff had experienced three seizures in three months and notes to the same effect regarding frequency by Dr. Richardson in support of the ALJ's conclusion that, "[b]ased on [Plaintiff's] statements to his treating neurologist, these seizures occur[red] about once a month, except for a spate of three episodes occurring on a single day in

---

[148]    Doc. 20, Pl.'s Mot. for Summ. J. p. 6.

December 2015."[149]  While Plaintiff is correct that the ALJ did not specifically cite Dr. Vu's January 20, 2016 treatment note recording Plaintiff's report of the December 2015 seizures or Dr. Vu's opinion in the Seizure Questionnaire, the ALJ did include information consistent with both.

Substantial evidence supports the ALJ's conclusion that "the documented frequency of seizure attacks does not satisfy either [Listing] 11.02 or 11.03."[150]  To be clear, Listing 11.02, the one under which Plaintiff argues he qualified as presumptively disabled, requires evidence that, on average, Plaintiff suffered *convulsive seizures more frequently* than once a month despite medication.  The medical record documented twenty seizures over the span from November 2013 (prior to the alleged onset date of December 21, 2013) to March 2016 (the latest documented seizure date[151]), a period of twenty-nine months.  Even assuming all of Plaintiff's documented seizures were convulsive, which itself is contrary to Plaintiff's self reporting and other evidence, he did not *average* one seizure per month.  Plaintiff failed to meet his burden of showing that his seizure disorder met the Listing 11.02 criteria.

---

[149]     Tr. 14.

[150]     Id.

[151]     In April 2016, Plaintiff reported experiencing three seizures over the prior three months.  See Tr. 1007.  Dr. Vu's note does not give the precise dates for those seizures.  See id.

The ALJ acted properly in not relying on one day or a few days in December, a mere snapshot of Plaintiff's experience, to determine whether Plaintiff's seizure disorder met Listing 11.02. The ALJ properly looked at the entire period of alleged disability. 42 U.S.C. § 423(d)(1)(a) (stating that an individual is disabled if he is unable work due to a medically determinable impairment that has lasted or can be expected to last for not less than twelve months).

Furthermore, the evidence does not support a conclusion that all twenty documented seizures were convulsive.  Plaintiff described seizures where he experienced only an alteration of awareness with little or no motor movements.  At his hearing, Plaintiff described nonconvulsive seizures during which he entered slumber states, spoke gibberish, rolled his eyes back, and ground his jaw.  Only six of the twenty documented seizures included details sufficient to label them as convulsive.[152]

The ALJ's determination at the Listing step is supported by substantial evidence.

## B.  **Treating Physicians**

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ is required to give good reasons for the

---

[152]  Plaintiff did not challenge the ALJ's finding that his seizure disorder did not meet the criteria of Listing 11.03, which applies to nonconvulsive seizures and requires a weekly frequency.  Regardless, the evidence of falls well short of establishing that frequency.

weight given a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *5. The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *1. However, when the stated opinions are "brief or conclusory," they are not entitled to controlling weight. Perez v. Barnhart, 415 F.3d 457, 466 (5th Cir. 2005). Epitomizing "brief or conclusory," questionnaires are not entitled to considerable weight. Foster v. Astrue, 410 F. App'x 831, 832-33 (5th Cir. 2011)(unpublished).

Plaintiff focuses on the ALJ's decision to accord little weight to the opinions of Dr. Richardson and Vu found in the Pain Questionnaire and the Seizure Questionnaire, respectively. Simply put, the opinions expressed in the Pain Questionnaire and the Seizure Questionnaire are not entitled to controlling weight. See Perez, 415 F.3d at 466. For the most part, they only required that the doctors circle or check answers from a limited list of options. Neither form requested any additional explanation, neither doctor provided it.

Beyond that, the ALJ provided good reasons for discounting the

weight he allowed them.  With regard to Dr. Richardson's opinion, the ALJ generously noted that the doctor gave "no more than a cursory explanation based in the medical evidence."[153]  The ALJ also found that the opinions therein were inconsistent with the record as a whole, specifically citing normal motor-functioning examinations since October 2014, three months prior to Plaintiff's shoulder surgery. Yet, Dr. Richardson opined that the pain and other symptoms in Plaintiff's left shoulder since October 2014 was so severe as to constantly interfere with his ability to perform even simple work tasks and that, on average, Plaintiff would experience six bad days per week and would be absent from work four or more days a month.

Moreover, substantial evidence supports the ALJ's assessment of Dr. Richardson's opinion.  Almost all of the treatment notes from Dr. Richardson's practice group noticeably lacked examination results and omitted any indication that Plaintiff was unable to perform work-related tasks, both before and after Plaintiff's shoulder surgery.  Although PA Slusher noted moderate shoulder pain with motion in May 2014, he identified no limitations on the range of motion for any joint.  Dr. Richardson and PA Slusher's primary treatment was radiography and medication for joint pain and swelling.  In October 2015, Dr. Richardson recommended Plaintiff rely on ibuprofen and staying active to alleviate pain.  Dr. Vu

---

[153]    Tr. 20.

also routinely observed no motor deficits.

Plaintiff suggests that the ALJ should have considered a closed period of disability prior to shoulder surgery.  However, Plaintiff cites no evidence, and the court found none, tending to establish that he was disabled by shoulder pain and function.

With regard to Dr. Vu's opinion, the ALJ noted that Dr. Vu's indication in the questionnaire that Plaintiff's medication was frequently titrated upward over time was not supported by the treatment records.  In fact, the records indicated that the Keppra dosage was 3,000 milligrams per day except when lowered due to seizure control or Plaintiff's confusion and that the Aptiom dosage was consistently 800 milligrams per day.  The ALJ further supported his decision to discount Dr. Vu's questionnaire by pointing out that the records did not reflect that Plaintiff experienced residual symptoms from his seizures that would precipitate four absences per month.  Yet, Dr. Vu opined that Plaintiff experienced, on average, one major seizure per month and no minor seizures, that Plaintiff's postictal symptoms included drowsiness, confusion, and deficits in concentrating, thinking, planning, communicating, and interacting, and that Plaintiff would be absent four or more days a month.

In addition to the reasons cited by the ALJ for discounting Dr. Vu's opinion, substantial evidence supports the weight that the ALJ gave Dr. Vu's opinion.  The documented severity and frequency

of seizures, fewer than one per month over more than two years, would not require four absences from work per month. During the year immediately prior to the date of Dr. Vu's questionnaire, the record indicated that Plaintiff suffered no more than eleven seizures, including three on one day. By their descriptions or lack thereof, no more than two of the eleven could be categorized as major. Plaintiff testified that he recovered from the major seizures in a matter of hours and from the nonconvulsive seizures in five to ten minutes.

On his recovery from seizures, Plaintiff argues that the ALJ ignored the residuals of Plaintiff's major seizures that resulted in hospitalizations and caused facial bruising. Without a doubt, Plaintiff occasionally suffered serious seizures that resulted in emergency treatment and additional injuries, but they were too infrequent to cause absences four times a month. The record, including Plaintiff's representations to his physicians and the SSA, conclusively showed that Plaintiff experienced minor seizures more than major seizures and, on average, experienced no more than one seizure of either kind per month.

The ALJ did not err by affording little weight to Drs. Richardson's and Vu's questionnaire opinions.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 19th day of February, 2019.

_____

U.S. MAGISTRATE JUDGE

34